IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER WALKER, | CIVIL DIVISION |
| Plaintiff, | Case No.   14-166 Erie |
| v. | |
| WAL-MART STORES EAST, LP, | |
| Defendant. | |

## COMPLAINT AND JURY DEMAND

A.  *Preliminary Statement*

1. The plaintiff Christopher Walker brings this action under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.,* to redress violations of his right to be free from employment discrimination based upon his disability and the Family Medical Leave Act (the "FMLA"), 29 U.S.C. § 2601 *et seq.* to redress violations prohibiting adverse job action, harassment and retaliation for requesting medical leave.  Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*  A jury trial is demanded.

B.  *Jurisdiction*

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 12117(a), 28 U.S.C. § 1331, 29 U.S.C. § 2617(a)(2) and under the doctrine of pendant jurisdiction.

3. In September 2013, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 553-2013-01177.  This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4. The EEOC issued a Notice of Right to Sue dated March 18, 2014.

5. The plaintiff filed this complaint within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C. *The parties*

6. The plaintiff Christopher Walker is an adult individual who resides at 1927 Prospect Avenue, Erie, PA 16510.

7. The defendant Wal-Mart Stores East, LP is an entity doing business in the Commonwealth of Pennsylvania, and, specifically, in this district. The defendant has a place of business located at 5741 Buffalo Road, Harborcreek, PA 16510, which is the location where the plaintiff was employed.

8. The defendant is a retail corporation that is part of a chain of large discount department stores and warehouse stores. At the time of his termination, the plaintiff was employed by the defendant as a stock associate/CartPusher.

9. At all times material, the defendant employed more than fifteen employees.

10. The defendant was the plaintiff's employer and is an employer within the meaning of the ADA, 42 U.S.C. § 12111(5) and the FMLA, 29 U.S.C. § 2611(4).

D. *Factual Background*

11. The plaintiff was hired by the defendant on November 18, 2011. He was employed as a stock associate/CartPusher from the date of his hire through his termination on March 2, 2013. His duties included bringing in carts from the parking lot, making sure that the parking lot was free of trash and debris and shoveling the parking lot and sidewalks during the winter.

12. The plaintiff has a disability as defined by the Americans with Disabilities Act ("ADA"). Specifically, he is partially deaf (left ear) and has a learning disability, both of which

are physical and/or mental impairments that substantially limits one or more of the major life activities of the plaintiff.

13. The plaintiff could perform all the essential functions of his job either with a reasonable accommodation or without any accommodation. During the course of his employment, the plaintiff did, in fact, perform his job in a competent fashion and was a satisfactory employee.

14. At all times relevant, the plaintiff's managers, as well as individuals in the human resources department, were aware of the plaintiff's disability.

15. While he was employed by defendant, the plaintiff was subjected to discriminatory treatment because of his disability and his termination was the result of discriminatory animus. Further, as detailed below, he was harassed, retaliated against and fired because of his requests and/or need for medical leave.

16. For example, co-workers and managers, including store managers, treated him like a child, making condescending statements to him and talking down to him while he was working. He often felt humiliated and embarrassed by this treatment, and felt like he did not have a voice or say in how he was treated because even the managers engaged in this belittling behavior.

17. The plaintiff was given a walkie-talkie with an earpiece to use during the day, so that he could be reached by managers while he was in the parking lot doing his job. The earpiece that he was provided fitted into his right ear and completely blocked his ability to hear the traffic and other noises in the parking lot, which posed a safety hazard to him. The plaintiff learned that another type of earpiece was available, that would fit over his right ear, instead of inside, which would allow him to hear outside ambient noises, but the defendant's managers claimed that the

didn't have that model available, would not get it and that he should just "deal" with the one they provided. The plaintiff made repeated requests to every level of management for an appropriate earpiece that would accommodate his situation. The defendant's managers kept putting the plaintiff off, and treating the request as trivial and an irritation. It took between four and six months before the plaintiff was finally provided with a suitable earpiece.

18. In July 2012, the plaintiff hit his head on the concrete entrance that the carts get pushed through. He felt dizzy and sick and his speech was slurred. He was taken to the emergency room and was diagnosed with a concussion. He had to take a couple of days off work due to this injury and had an appointment scheduled with the defendant's workers' compensation doctor. All of this was cleared with the defendant ahead of time. The day before his appointment with the doctor, the defendant's Human Resources Manager, Susan Womack, called the plaintiff at home and told him that "he wasn't that hurt; he needed to get back to work immediately and that "he was in trouble" for taking time off due to his injury. Womack used language that confused the plaintiff due to his learning disability, but Womack would not take the time to explain the situation in a way that he could understand. Assistant Store Manager Peggy [last name unknown] told the plaintiff's wife that, if the plaintiff did not return to work, he would get fired and the days he took off due to his injury "would count against him". This type of harassing and retaliatory treatment is violative of the FMLA. The plaintiff was seen by the workers' compensation doctor the next day and the plaintiff was cleared to return to work, which he did.

19. In February 2013, the plaintiff injured his left shoulder while pushing carts through the snow. The next day, the plaintiff was in extreme pain and could barely move his shoulder. A store manager, Steve [last name unknown], asked if the plaintiff wanted to go to the

doctor and the plaintiff said yes.  Manager Steve took the plaintiff to get drug tested first; which came back negative, and dropped the plaintiff off at the store telling him to call his wife to get a ride to the workers' compensation approved Urgent Care facility.  When the plaintiff arrived at the facility, he was told that he could not be seen without a defendant's manager also being present.  Front End Manager Amy [last name unknown] claimed that she was the only manager in the store and that she could not leave even if the plaintiff spent the entire night at the Urgent Care facility.  This was not true; other managers were present at the store at the time, as per the defendant's policies.  The plaintiff's wife called Front End Manager Amy and complained about the way the plaintiff was being treated.  Shortly thereafter, a manager arrived at the Urgent Care facility and the plaintiff was seen and treated by a doctor who diagnosed the plaintiff with a shoulder sprain and released him back to work as long as he used the cart machine with his right arm and shoulder.  The doctor scheduled a follow up appointment

20. The next day, the plaintiff returned to work and started working his shift.  A manager told the plaintiff that he was not permitted to push carts due to his injury and transferred him inside to do other jobs that involved lifting and required use of his left shoulder.  The plaintiff's assigned work activities ended up exacerbating the pain in his left shoulder.  The plaintiff was in so much pain that he became nauseous and he asked if he could take FMLA leave time until his doctor's appointment.

21. Human Resource Manager Womack and Manager Peggy ganged up on the plaintiff and told him that he could not have FMLA paperwork and could not take FMLA leave because this was a work injury.  They threatened that he may not have a job to return to if he took time off of work.  They accused him of "refusing" to do his job.  They brought in other managers and starting talking about the plaintiff right in front of him, acting like he was not

present.  The plaintiff became so sick to his stomach because of the pain, he had to excuse himself from this confrontation to go to the bathroom so that he could throw up.  When he returned, he told the defendant's managers that he had to go home with or without the FMLA paperwork.  Manager Peggy said "fine" in a condescending voice.

22. On the third day of his leave, and a day before his doctor's appointment, Manager Peggy called the plaintiff's wife and complained that the plaintiff would not do his job.  The plaintiff's wife explained that the plaintiff wanted to work, but needed time to take care of his shoulder and had requested FMLA leave due to his injury.  The plaintiff's wife also reminded Manager Peggy that the plaintiff had a learning disability and had difficulty understanding the legal concepts behind the FMLA.  Manager Peggy then responded, "oh, he's one of those people".  The plaintiff's wife then explained that the plaintiff had a doctor's appointment the next morning and would be into work immediately afterwards, albeit late for his shift, as long as the doctor cleared him.  Manager Peggy said that was fine and that if he came in late, it would not be held against him.

23. The next day, the plaintiff saw the doctor and was cleared for work.  He immediately went to the store to start his shift and was late because of his doctor's appointment.

24. Two days later, on March 2, 2013, the plaintiff was pushing carts into the cart corral and a piece of the door broke off.  This happened several times in the past.  The plaintiff informed the defendant's managers and was told that they would take care of it.

25. A couple hours later, the plaintiff was called into the office and told that he was being written up for being late on the day of the doctor's appointment even though he had advised Manager Peggy of this fact ahead of time and the tardiness was approved.  At the end of the day, two assistant managers called the plaintiff into the security office and advised him that

his employment was being terminated because he was "accident prone" and a "risk to have there".

26. However, the reasons given for his termination were nothing more than a pretext and the real reasons for his termination was because of his disability and in retaliation for having requested FMLA leave time.

**FIRST CAUSE OF ACTION**

27. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

28. The plaintiff has a disability and thus is protected against discrimination under the ADA.

29. The plaintiff was qualified for his position.

30. The plaintiff was able to perform his position with or without a reasonable accommodation.

31. Despite his qualifications, the plaintiff was terminated. The reasons given for his discharge were a pretext.

32. The defendant's discharge of the plaintiff was because of his disability, in violation of the ADA.

33. At all times relevant, the defendant knew of the plaintiff's disability and/or regarded the plaintiff to be a disabled individual.

34. The defendant's violation of the ADA was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of discrimination.

**SECOND CAUSE OF ACTION**

35. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

36. The defendant's managers refused to grant FMLA time after it was requested by the plaintiff and further refused to provide him with FMLA paperwork to complete after he asked for it.

37. The defendant's managers misled the plaintiff and gave him incorrect information that he was not entitled to FMLA leave time because he had sustained a work injury.

38. The defendant's managers harassed the plaintiff regarding his requests for FMLA leave and his requests for medical attention.

39. The defendant's managers retaliated against the plaintiff regarding his requests for FMLA leave and his requests for medical attention.

40. The defendant's violation of the FMLA was committed with intentional or reckless disregard for the plaintiff's federally protected rights.

**THIRD CAUSE OF ACTION**

41. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

42. As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination and harassment under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

WHEREFORE, the plaintiff respectfully requests judgment be entered in his favor and against the defendant and that the defendant be required to provide all appropriate remedies under the ADA, the FMLA and the PHRA, including attorney's fees and costs.

                              Respectfully submitted,

                              */s/ Michael J. Bruzzese*
                              Michael J. Bruzzese
                              Pa. I.D. No. 63306

                              JOHNSON, BRUZZESE & TEMPLE
                              1720 Gulf Tower
                              707 Grant Street
                              Pittsburgh, PA 15219

                              (412) 281-8676

                              Counsel for the plaintiff

Dated:  June 16, 2014